Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert R. Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore Maya (SBN 223242)
tmaya@ahdootwolfson.com
Lisa Cintron (SBN 356009)
lcintron@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave., Suite 500
Burbank, California 91505
(310) 474-9111 (telephone)
(310) 474-8585 (facsimile)

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

JAY PARIKH, SIENNA KNOX, MELANIE MELARAGNO, and JOHN SCHILLING, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC.,

Defendant.

Case No. 2:26-03288

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1. Violation of Consumer Legal Remedies Act, California Civil Code § 1750, *et seq.*
2. Violation of California Unfair Competition Law, California Business & Professions Code § 17200, *et seq*.
3. Violation of Arizona Consumer Fraud Act, Ariz. Rev. Stat. §44-1521, *et seq.*
4. Violation of Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq.*
5. Negligence
6. Product Liability – Design and/or Manufacturing Defect
7. Violation of Song-Beverly Consumer Warranty Act, California Civil Code § 1790, *et seq.*

8. Breach of Express Warranty
9. Breach of Implied Warranty of Merchantability

Hon. George H. Wu, presiding

No Trial Date Set

Plaintiffs Jay Parikh, Sienna Knox, Melanie Melaragno, and John Schilling (collectively, "Plaintiffs"), by and through counsel, bring this First Amended Class Action Complaint on behalf of themselves and all others similarly situated against Volkswagen Group of America, Inc. d/b/a Audi Of America, Inc. ("Defendant" or "Audi"). Plaintiffs allege, upon personal knowledge as to their own actions and counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. Plaintiffs bring this action individually and on behalf of a class of current and former owners and lessees ("Class members") of Audi vehicles equipped with defective door locking systems, as described in further detail below. In short, the door locking systems on these vehicles rely, in whole or in part, on electronic locking mechanisms and software that intermittently fails, thereby preventing the vehicle's door-locking mechanism from engaging or releasing (the "Locking Defect"), causing drivers and passengers to be locked in or out of the vehicles.

2. Audi vehicles plagued by the Locking Defect include: 2019–2024 A6, A7, A8, S8, and Q8 models; 2019 and 2021–2024 e-tron quattro models; 2020–2024 A6 allroad, S6, S7, S8, e-tron Sportback quattro, SQ8, and RS Q8 models; 2020–2021 A8 e quattro models; 2020–2022 RS 6, RS 7, A8 PHEV, e-tron quattro, and e-tron sportback quattro models; 2022 e-tron S quattro, e-tron GT, and RS e-tron GT models; 2021–2022 A6 Avant, RS 6 Avant, and A7 PHEV models; 2021–2024 RS 6 Avant and RS 7 models; 2021–2022 A7 e quattro models; 2022–2024 e-tron S, e-tron GT, and RS e-tron GT models; 2025 A6 Sportback e-tron, S6 Sportback e-tron, Q6 e-tron, Q6 Sportback e-tron, SQ6 e-tron, and SQ6 Sportback e-tron models; 2025-2026 A5, S5, S5 Sportback, Q5, Q5 Sportback, and SQ5 Sportback models; and 2026 A6 models. Collectively, these models are referred to as the "Class Vehicles," or "Vehicles," herein.

3. Since approximately 2019, Defendant designed, manufactured, distributed, marketed, sold, and leased to Plaintiffs and Class members Audi Class Vehicles equipped with defective door locking systems as described herein. The door

locking systems rely, in whole or in part, on electronic locking mechanisms and software that intermittently fails, thereby preventing the Vehicle's door-locking mechanism from engaging or releasing.

4. When the door-locking mechanism fails to release, the Vehicles cannot be opened from either inside or outside the Vehicle. This defect presents a serious safety issue for occupants of the Vehicles, as they can be trapped in the Vehicles after an accident or on a hot sunny day, or they can be locked out of the Vehicles in potentially dangerous situations. Conversely, when the door-locking mechanism fails to engage, the Vehicles cannot be secured. As a result, the luxury Vehicles and their contents are left vulnerable to theft. The failure to lock poses personal safety concerns and significantly reduces the value of the Vehicles.

5. Although the Vehicles' door locks were specifically designed, manufactured, and approved by Defendant to be installed on the Vehicles, the electronic and semi-electronic door locks intermittently fail either to lock or unlock, resulting in dangerous situations where Vehicle owners are locked out, children are locked in, or the Vehicle is left unlocked in unsafe locations.

6. The Locking Defect occurs during normal use and operation of the Vehicles.

7. Defendant's marketing aims to convince consumers that the Class Vehicles are high-quality, safe, and dependable. But Defendant has misrepresented and actively concealed the existence, causes, and consequences of the Locking Defect, which results in the failure of the Vehicles' essential purpose: to transport drivers and passengers reliably and safely.

8. For example, Class Vehicles sold at Audi dealerships are each sold with window stickers (i.e., the Monroney sheets/stickers displayed in the Class Vehicle windows at dealerships), dealership literature, warranty information, and owner's manuals, but these materials disclose nothing about the Defect. The window stickers for the Class Vehicles advertise electronic features and the warranty and maintenance

booklet discusses the locking system, but neither mentions the Defect. Each would have been an appropriate location to identify the Defect, but Defendant failed to do so.

9. Defendant failed to disclose the Defect to consumers despite having knowledge of it. Defendant has long known about it from, among other sources, internal warranty and repair records submitted directly to Defendant and to its authorized dealers, and through consumer complaints. As evidenced by the complaints of Plaintiffs and other Vehicle owners that have been filed with the National Highway Traffic Safety Administration ("NHTSA"), the Vehicles' Locking Defect arises unexpectedly and presents ongoing safety concerns.

10. Based upon pre-sale testing and the NHTSA complaints, Defendant has been on notice of the Locking Defect and resulting safety concerns since at least 2019. Yet, Defendant has done little, if anything, to resolve this glaring safety concern. Nor has Defendant recalled the Vehicles or announced the defect to the public or its customers. Defendant and its authorized dealerships do not forewarn purchasers despite their knowledge of the Locking Defect that the Vehicles have one or more defects, including but not limited to defects manifesting as an inability to either lock or unlock Vehicle doors when the lock function is applied during ordinary and intended use.

11. Defendant knew about the Defect based upon its own rigorous and extensive pre-sale testing of the Vehicles, which replicates actual, real-world consumer use of the Vehicles. Because of the ubiquitous nature of the Defect in the Vehicles, and because the Defect occurs under ordinary driving conditions, Defendant's pre-sale testing would have necessarily revealed the Defect.

12. Despite its pre-sale superior knowledge of the Locking Defect and the ancillary safety issues that result, Defendant failed to disclose this material information, and has further failed to provide an adequate remedy to address it. Instead, Defendant actively concealed the Defect from the public and continues to withhold this material information while reaping the benefit of revenues generated from repair and replacement services necessitated by the Defect.

13. Drivers in our mobile society often take for granted the ease with which they can secure and unlock their car. However, Plaintiffs and Class members facing the Locking Defect here understand the terror of being unable to unlock your Vehicle while your child sits inside on a hot and sunny day, of approaching your car late at night in a dark alley and being unable to reach the safety of your locked car, or of knowing that even though the Vehicle locked today it may not lock tomorrow when you arrive downtown for an important meeting. The physical safety concerns here are staggering.

14. The locking mechanisms on these high-end, luxury Vehicles—which had a Manufacturer's Suggested Retail Price beginning at nearly $70,000 in 2021—should not lock owners in or out of the car in needlessly dangerous circumstances. Nor should these luxury Vehicles be left unsecured in public settings. Accordingly, this action is brought to redress Defendant's misconduct, including Defendant's conscious effort to conceal material facts concerning the Locking Defect during and after the design, distribution, marketing, and sale and/or lease of the Vehicles.

## PARTIES

**Plaintiff Jay Parikh**

15. Plaintiff Parikh is a California citizen residing in Montebello (Los Angeles County), California. On April 9, 2024, Plaintiff Parikh purchased a certified pre-owned 2021 Audi e-tron for $39,592.59 from Audi North OC, an authorized Audi dealership located in Placentia, California. The odometer indicated the Vehicle had 30,360 miles. The Vehicle came with a 4-year/50,000 mile New Vehicle Limited Warranty and 1-year/20,000 mile Certified Pre-Owned Limited Warranty.

16. This Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Defendant.

17. The Vehicle's safety, reliability and quality were important factors in Plaintiff Parikh's decision to purchase the Vehicle. Before making his decision, Plaintiff Parikh researched details about the Vehicle by reviewing Audi's corporate website, the website hosted by the dealership, and the Vehicle's Monroney sticker. Plaintiff Parikh

also reviewed the dealership's certified pre-owned inspection checklist which indicated that the lock/unlock operation was functioning and failed to disclose the Locking Defect. Plaintiff also spoke to a representative of the authorized Audi dealership and test drove the Vehicle. Plaintiff Parikh selected and ultimately purchased his Class Vehicle because the Vehicle was represented to be and marketed as a high-quality luxury vehicle capable of providing safe and reliable transportation.

18. Before purchasing his Vehicle, Plaintiff Parikh had no forewarning of the Locking Defect. Defendant's omissions were material to Plaintiff Parikh.

19. Plaintiff Parikh has at all times used the Vehicle in a reasonable, ordinary manner, and not in any way which would cause the lock system to fail.

20. Shortly after purchasing the Vehicle, the Locking Defect began to manifest in Mr. Parikh's Vehicle.

21. In one particularly alarming incident, the failure to unlock left Plaintiff Parikh's infant son trapped in the back seat of the Vehicle, while Plaintiff Parikh and his wife were locked out of the Vehicle.

22. The unreliability of the locking mechanism continues to be extremely alarming to Plaintiff Parikh.

23. The unreliability of the locking and unlocking mechanism also impacted Plaintiff Parikh's driving decisions, including, but not limited to, altering the use of his car and parking habits in anticipation of the extremely dangerous situation and in fear that the Locking Defect would present itself in another similarly dangerous situation.

24. On May 3, 2024, Plaintiff Parikh took his Vehicle to the dealership to repair the Locking Defect. He has taken his Vehicle back to the dealership to repair the Locking Defect at least three additional times during the warranty period. The dealership has replaced two door latches on the Vehicle, but the Locking Defect continues to manifest.

25. Despite his repeated efforts to address the Defect within the warranty period, Defendant neither resolved, nor established that it is capable of resolving, this ongoing safety hazard.

26. Plaintiff Parikh has informed Defendant about the Defect both through repeated visits to and communications with the dealership and by filing a complaint with NHTSA regarding the unresolved Locking Defect.

27. Plaintiff Parikh has been harmed as a result of Defendant's conduct as alleged herein. Had Defendant disclosed the Locking Defect to him, through, for example Defendant's corporate or dealership websites, the warranty and maintenance booklets, or the Monroney sticker, Plaintiff Parikh would have been aware and would have behaved differently. Plaintiff Parikh would have purchased a different vehicle or would have paid less for his Vehicle. He did not receive the benefit of his bargain when he purchased the Vehicle.

**Plaintiff Sienna Knox**

28. Plaintiff Knox is a citizen of Arizona residing in Goodyear, Arizona. On September 24, 2025, Plaintiff Knox co-signed a lease agreement for a new 2025 Audi Q6 e-tron for $71,965.97 from Audi Arrowhead, an authorized Audi dealership located in Peoria, Arizona. The Vehicle came with a 4-year/50,000 mile New Vehicle Limited Warranty, and Plaintiff Knox purchased an additional AutoNation protection plan from the dealership for $2,423.

29. This Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Defendant.

30. The Vehicle's safety and reliability were important factors in Plaintiff Knox's decision to lease the Vehicle. Before making her decision, Plaintiff Knox and her husband researched details about the Vehicle by reviewing Audi's corporate website, reviewing the website hosted by the dealership, and by comparing the Vehicle to other electric cars on the market. Plaintiff Knox also reviewed the Vehicle's Monroney sticker and spoke to two representatives of the authorized Audi dealership who both assured her

of the quality, safety, and reliability of the Vehicle. Before agreeing to lease the Vehicle, Plaintiff Knox and her husband each test drove the Vehicle. Additionally, Plaintiff Knox explored the Vehicle for 45 minutes while the Audi representatives taught her about various features in the Vehicle. As part of the lease process, Plaintiff Knox received the Vehicle's warranty and maintenance booklet. Plaintiff Knox selected and ultimately leased her Class Vehicle because the Vehicle was represented to be and marketed as a high-quality luxury vehicle capable of providing safe and reliable transportation.

31. Plaintiff Knox received no forewarning of the Vehicle's defective locking system prior to leasing the Vehicle. Defendant's omissions were material to Plaintiff Knox.

32. Just one day after signing the lease agreement, Plaintiff Knox experienced the first frightening manifestation of the Locking Defect. While running errands during an Arizona heatwave, Plaintiff Knox was unable to open the driver or passenger doors while her infant and five-year-old children were locked inside the Vehicle in the middle of a scorching asphalt parking lot where temperatures likely reached well over the 100 degrees forecasted for the day. The Defect has trapped Plaintiff Knox's small children inside the car on multiple other occasions, including on April 6, April 20, and May 28, 2026. When the Defect occurs, a warning appears on the dashboard indicating a "Central locking malfunction."

33. Plaintiff Knox has at all times used the Vehicle in an ordinary manner and not in any way which would cause the lock system to malfunction.

34. Plaintiff Knox has taken her Vehicle to the dealership to repair the Defect at least four times. She has provided Defendant with videos and photos of the Defect and the accompanying dashboard warnings. The Defect also repeatedly manifested in the presence of the mechanics at the dealership. In one instance, the dealership was locked out of the Vehicle, eventually gained access, updated the software, and washed the Vehicle and its sensors to no avail. The Vehicle remained with the dealership for two weeks. The Defect manifested again within one hour of picking the Vehicle up from

the dealership. In another instance, Plaintiff received a loaner vehicle in which she experienced the same Locking Defect.

35. Plaintiff Knox has informed Defendant about the Defect both through repeated visits to and communications with the dealership and by contacting Defendant directly on numerous occasions, including providing videos and photos of the Defect and the accompanying dashboard warnings. On April 12, 2026, Plaintiff Knox emailed Defendant's customer service the following message:

> [T]he central locking ALWAYS malfunctions. It will not stop malfunctioning, which has led to the car locking my kids on the inside and my key not unlocking it. On top of that, my keyless entry has never worked. It won't connect. I will have to yank on the handle over and over to get it [to] finally unlock, but its been up to a minute. [I'm] not doing this when its July in [A]rizona and my kids get locked in the car.

36. On April 17, 2026, Plaintiff Knox informed Defendant's customer service:

> We have complained multiple times to the GM at the dealership about the issue of the car locking the kids inside my car. They told me verbally that there is no fix, but to do the KD2 update and that "should" fix the issue. The issue has gotten worse.

37. Despite her repeated and extensive efforts to address the Defect, Defendant has neither resolved, nor established that it is capable of resolving, this ongoing safety hazard. Without a resolution, Plaintiff Knox fears that the Defect will trap her children inside the Vehicle during Arizona's intense summer heat.

38. Plaintiff Knox has been harmed as a result of Defendant's conduct as alleged herein. Had Defendant disclosed the Locking Defect to her, through, for example, the Audi or dealership website or through the Monroney sticker, she would have been aware of the Defect and would have behaved differently. Plaintiff Knox would have leased a different vehicle or paid less for it.

**Plaintiff Melanie Melaragno**

39. Plaintiff Melaragno is an adult citizen of Ohio residing in Wickliffe, Ohio. On July 31, 2025, Plaintiff Melaragno purchased a certified pre-owned 2023 Audi Q8 premium plus for $63,881.87 from Audi Mentor, an authorized Audi dealership located in Mentor, Ohio. The odometer indicated the Vehicle had 22,474 miles. The Vehicle came with a 4-year/50,000 mile New Vehicle Limited Warranty and a 1-year/20,000 mile Certified Pre-Owned Limited Warranty.

40. This Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and/or warranted by Defendant.

41. The Vehicle's safety and reliability were important factors in Plaintiff Melaragno's decision to lease the Vehicle. Plaintiff Melaragno's mother always wanted an Audi for its luxury and quality, but she never got the chance. After her mother's passing, Plaintiff Melaragno wanted to purchase an Audi in her honor of her mother. In July of 2025, Plaintiff Melaragno saw an advertisement for an Audi Q8 that she wanted to test drive at her local dealership. Before making her decision, Plaintiff Melaragno researched details about the Vehicle by reviewing Audi's corporate website and reviewing the details of the Vehicle listed on the website hosted by the dealership. Plaintiff Melaragno spoke to a representative of the authorized Audi dealership who assured her of the quality, safety, and reliability of the Vehicle. She also reviewed the dealership's certified pre-owned inspection checklist which indicated that the lock/unlock operation met Audi pre-certification standards and failed to disclose the Defect. Before agreeing to purchase the Vehicle, Plaintiff Melaragno test drove the Vehicle through the local neighborhood. Plaintiff Melaragno selected and ultimately purchased her Class Vehicle because the Vehicle was represented to be and marketed as a high-quality luxury vehicle capable of providing safe and reliable transportation.

42. Plaintiff Melaragno received no forewarning of the Vehicle's defective locking system prior to purchasing the Vehicle. Defendant's omissions were material to Plaintiff Melaragno.

43. On April 19, 2026, while visiting her daughter at Ohio State University, Plaintiff Melaragno experienced a particularly stressful and alarming manifestation of the Locking Defect. Plaintiff's Vehicle was parked on the side of a busy roadway. She was packing up her Vehicle late at night to begin the two-hour drive home. As she loaded her daughter's belongings into the trunk, Plaintiff Melaragno placed her purse down in the trunk with her key fob inside. After closing the trunk and proceeding to the front door, Plaintiff Melaragno returned to the trunk to collect her purse. However, the Vehicle unexpectedly and without prompting locked all doors and the trunk, leaving Plaintiff's purse and key fob locked inside the Vehicle. The Audi mobile application was not working properly, and incorrectly and repeatedly indicated that the Vehicle was unlocked, yet Plaintiff Melaragno was unable to gain access to the Vehicle. Plaintiff Melaragno called Audi roadside assistance and was told that the Vehicle would need to be towed to a dealership, all of which were closed. So, the problem would not be addressed until the morning, impacting Plaintiff Melaragno's work schedule and leaving her stranded more than two hours from home. After repeated attempts to request help through the mobile application, Plaintiff Melaragno was able to convince Audi to send roadside assistance that night. To gain access to the Vehicle through the frameless window, roadside assistance had to jimmy the window open. The Defect has left Plaintiff Melaragno fearful that she was will again find herself locked out of her Vehicle at any time, especially in dangerous circumstances.

44. Plaintiff Melaragno has at all times used the Vehicle in an ordinary manner and not in any way which would cause the lock system to malfunction.

45. Plaintiff Melaragno has taken her Vehicle to the dealership to repair the Defect multiple times and Defendant has not resolved the Defect.

46. Plaintiff Melaragno has informed Defendant about the Defect both through repeated visits to and communications with the dealership and by contacting Defendant directly on numerous occasions.

47. Despite her repeated efforts to address the Defect, Defendant has neither resolved, nor established that it is capable of resolving, this ongoing safety hazard. Instead, Defendant has improperly shifted the blame onto Plaintiff Melaragno, alleging improper use of the key fob. Without a resolution, Plaintiff Melaragno is unable to rely on her Vehicle for transportation and fears that the Defect will leave her locked out of her Vehicle and stranded in dangerous circumstances.

48. Plaintiff Melaragno has been harmed as a result of Defendant's conduct as alleged herein. Had Defendant disclosed the Locking Defect to her, through, for example the dealership website, Plaintiff Melaragno would have been aware and would have behaved differently. Plaintiff Melaragno would not have purchased the Vehicle, as she already owned a functioning vehicle outright, or Plaintiff Melaragno would have paid less for her Vehicle. She did not receive the benefit of the bargain when she purchased the Vehicle.

**Plaintiff John Schilling**

49. Plaintiff Schilling is a California citizen residing in Manhattan Beach (Los Angeles County), California. On April 3, 2025, Plaintiff Schilling leased a 2025 Audi S5 Sportback for $67,602 from Audi North OC, an authorized Audi dealership located in Placentia, California. The odometer indicated the new Vehicle had 14 miles. The Vehicle came with a 4-year/50,000 mile New Vehicle Limited Warranty.

50. The Vehicle's safety, reliability and quality were important factors in Plaintiff Schilling's decision to purchase the Vehicle. He trusted the quality and luxury of Audi vehicles and specifically sought a red Audi S5. Plaintiff Schilling watched the inventory at his local Audi dealership via the dealership's website. When a car meeting his specifications appeared, Plaintiff Schilling reviewed the details about the Vehicle provided on the dealership's website. Based upon the dealership's description of the Vehicle, Plaintiff Schilling visited the dealership where he reviewed the Vehicle's Monroney sticker, spoke with a sales representative, test drove the Vehicle, and received the warranty and maintenance booklet. Plaintiff Schilling selected and ultimately leased

his Class Vehicle because the Vehicle was represented to be and marketed as a high-quality luxury vehicle capable of providing safe and reliable transportation.

51. Before purchasing his Vehicle, Plaintiff Schilling had no forewarning of the Locking Defect. Defendant's omissions were material to Plaintiff Schilling.

52. Plaintiff Schilling has at all times used the Vehicle in a reasonable, ordinary manner, and not in any way which would cause the lock system to fail.

53. Shortly after leasing the Vehicle, the Locking Defect began to manifest in Plaintiff Schilling's Vehicle. He routinely struggles to lock and unlock the Vehicle during ordinary use.

54. The unreliability of the locking mechanism continues to be extremely frustrating to Plaintiff Schilling, who often travels for work and compares the reliability of his more-affordable rental cars to the ongoing failure of his high-end Vehicle's locking system.

55. On October 16, 2025, Plaintiff Schilling took his Vehicle to the dealership to repair locking issues manifesting in an inability to open his trunk. The dealership replaced the electronic control unit, which only partially resolved the locking issue. Plaintiff Schilling remains unable to reliably lock and unlock the Vehicle doors and trunk.

56. Plaintiff Schilling informed Defendant about the Defect through his communication with the dealership regarding its manifestation as to the trunk. Even so, Defendant has long known about the Defect based upon the other complaints, repairs, and NHTSA filings regarding the unresolved Locking Defect that are complained of herein.

57. Plaintiff Schilling has been harmed as a result of Defendant's conduct as alleged herein. Had Defendant disclosed the Locking Defect to him, through, for example the dealership website, the warranty and maintenance booklets, or the Monroney sticker, Plaintiff Schilling would have been aware and would have behaved differently. Plaintiff

Schilling would have leased a different vehicle or would have paid less for his Vehicle. He did not receive the benefit of his bargain when he leased the Vehicle.

**Defendant Volkswagen Group of America, Inc.**

58. Volkswagen Group of America, Inc., doing business as Audi of America, Inc. ("Audi" or "Defendant"), is a corporation organized and in existence under the laws of the State of New Jersey with its headquarters located in Reston, Virginia. At all times relevant herein, Audi was engaged in the business of importing, advertising, marketing, distributing, warranting, servicing, repairing and selling automobiles and other motor vehicles and motor vehicle components throughout the United States of America. Audi is also the warrantor and distributor of Audi vehicles, including the Class Vehicles in California, Arizona, Ohio, and throughout the United States of America.

59. Audi has thousands of authorized dealerships across the United States—operating as Audi's agents—and controls the distribution of automobiles, parts, and services, and warranty repairs for Audi vehicles throughout the United States, all of which are under Audi's control. Audi authorizes these distributors and dealerships to sell Audi vehicles, parts, and accessories, and to service and repair Audi vehicles using Audi parts. Audi exerts control over its dealership-agents through the technical service bulletins and other repair guidance it issues to its dealerships relating to problems arising with Audi vehicles, including the Defect in the Vehicles, and instructing dealerships how to perform repairs. Audi's warranty directs Vehicle owners and lessees to present their Vehicles to authorized Audi dealers for repairs and service; and Audi requires authorized dealerships to submit detailed data to Audi regarding repairs performed at dealerships.

## JURISDICTION AND VENUE

60. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

61. The Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts substantial business in California, generally, and this District, specifically. Defendant has advertised, marketed, promoted, distributed, and sold the Vehicles in California.

62. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to this action occurred in this District as the Locking Defect manifested itself within this District in the Vehicles of Plaintiffs Parikh and Schilling.

63. To the extent there is any contractual or other impediment to pursuit of these claims on a class action basis, Plaintiffs specifically allege, and will prove, if necessary, that any bar to class action proceedings is unconscionable, unfair and against public policy.

## FACTUAL ALLEGATIONS

### A. The Locking Defect

64. The Class Vehicles come equipped with either fully-electric or semi-electric door locking systems. Defendant marketed its locking system as a standard feature in all Class Vehicles. However, the Class Vehicles include locking systems that are prone to malfunction and failure upon ordinary use.

65. Defects in the Class Vehicles' electronic and semi-electronic locking systems cause Vehicle owners to be locked out of their Vehicle or unable to lock their Vehicle. The ongoing risk of harm to Vehicle owners' physical safety and that of their property presents an ongoing problem that Audi has long known.

66. As a result of the Locking Defect, there is no reasonable way to open the Vehicle doors, often leaving Vehicle owners and/or their passengers stranded or trapped, or their valuables unsecured. Also as a result of the Locking Defect, there is no reasonable way to lock the Vehicles, leaving owners unable to secure the Vehicles in public settings. These failures pose serious safety and security risks for consumers operating and traveling in the Vehicles.

67. Additionally, as a result of the Locking Defect Plaintiffs and Class Members, either consciously or subconsciously, and in whole or in part, make driving decisions based upon the likelihood of the Vehicles' expected failure to lock or unlock. This powerful and ongoing distraction while operating an automobile makes the Vehicles unreasonably dangerous and unable to meet a minimal level of quality or safety.

68. As a result of the Locking Defect, Plaintiffs and Class members have been forced to troubleshoot the issue themselves and seek assistance from Defendant, locksmiths and towing companies. Defendant has failed to provide any resolution, let alone a lasting resolution, for of this known safety defect.

69. Plaintiffs and the Class have been damaged by Defendant's misrepresentations, concealment, and non-disclosure of the Locking Defect in the Vehicles, as they now have Vehicles whose value has greatly diminished because of Defendant's failure to timely disclose the serious Locking Defect.

70. Had Plaintiffs and Class members known about the Locking Defect at the time of sale or lease, as well as the associated costs related to the Locking Defect, Plaintiffs and Class members would not have purchased or leased the Class Vehicles or would have paid less for them.

71. As a result of Defendant's practices, Plaintiffs and Class members purchased or leased Vehicles they otherwise would not have, paid more for those Vehicles than they would have paid, were subjected to an unreasonable risk to their safety, and unnecessarily paid and will continue to pay repair costs as a result of the Locking Defect. They did not receive the benefit of their bargain.

**B. The Locking Defect Was in Defendant's Exclusive Knowledge and Control**

72. Throughout the relevant period, Defendant designed, manufactured, distributed, imported, warranted, marketed, advertised, serviced, sold, and leased the Class Vehicles with the Locking Defect. Upon information and belief, Defendant has sold, directly or indirectly through dealers and other retail outlets, thousands of Class

Vehicles in California and nationwide. The defective components were designed, installed, and/or manufactured by Defendant, and were present in the Class Vehicles at the time of sale.

73. No reasonable consumer expects the door locking system to fail within the normal useful life of the Vehicles, much less when they are new.

74. Upon information and belief, Defendant was aware of the Defect for years and well before Plaintiffs purchased their Class Vehicles. Defendant learned of the Defect through sources such as pre-release testing and evaluation; repair data; replacement part sales data; early consumer complaints made to Defendant, NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Defendant's dealerships; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

75. While designing, manufacturing, engineering, and testing Class Vehicles in advance of the Vehicles' release, Defendant would have gained comprehensive and exclusive knowledge about the locking system in the Class Vehicles. Adequate pre-release analysis of the design, engineering, and manufacture of Class Vehicles would have revealed to Defendant that the design and/or manufacture of the locking system was defective and susceptible to failure as detailed herein.

76. Upon information and belief, Defendant was further placed on notice as early as 2019 that the locking systems in the Vehicles are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendant failed to recall the Vehicles or disclose the Locking Defect to Plaintiffs and the Class members at the time of purchase or lease and thereafter.

77. Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"), 49 U.S.C. §§ 30101-30170, and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, including with regard to the "nonoperational safety of a motor vehicle," the manufacturer must

promptly disclose the defect. 49 U.S.C. §§ 30102(a)(9), 30118(c)(1) & (2). If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must timely remedy the defect. 49 U.S.C. §§ 30118(b)(2)(A) & (B). Upon information and belief, Defendant also violated the TREAD Act by failing to timely inform NHTSA of the Locking Defect and allowed the Vehicles to remain on the road with these defects. These same acts and omissions also violated various state consumer protection laws as detailed below.

78. Defendant has long known that the Vehicles have a defective locking system. Defendant has exclusive access to information about the defects through its dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other sources of aggregate information about the problem. In contrast, the Locking Defect was not known or reasonably discoverable by Plaintiff and Class Members prior to purchase and without experiencing the Locking Defect firsthand.

79. Defendant owes a duty to disclose the Locking Defect to Plaintiffs and Class members because Defendant has exclusive knowledge or access to material facts about the Vehicles that are not known or reasonably discoverable by Plaintiffs and Class members until the defect has manifested; and because Defendant has actively concealed the Locking Defect from its customers. Improperly operating locking systems on a vehicle undoubtedly pose a safety defect.

80. Defendant knew of the defects in their locking system, including the systems' likelihood of locking Vehicle owners in or out of their Vehicle, before selling the Vehicles to Plaintiffs and the Class and installing the defective locking systems in their cars, but did not inform Plaintiffs and the Class of this fact prior to their purchase.

81. Specifically, Defendant has issued numerous Technical Service Bulletins ("TSBs") relating to malfunctions in the Vehicles' locking system, dating as far back as 2021. These include TSBs dated April 14, 2026; April 13, 2026; March 25, 2026; February 27, 2026; June 7, 2023; and December 8, 2021.

82. As Defendant admitted in the December 8, 2021 TSB, potential causes of the Locking Defect include electronic and mechanical errors.

83. Despite knowing of the Locking Defect for so many years, Defendant has failed to fix it in newer models; to the contrary, if anything the problem seems to be worse in the newest Class Vehicles. As explained in the February 27, 2026, TSB, no solution is currently available for the newest 2025-2026 models. That same TSB instructs mechanics not to "replace any components for this condition since this will not resolve the customer's concern." The April 14, 2026, TSB includes the same language.

84. The February 27, 2026, TSB further instructs Defendant's agents to "explain to the customer that a solution is expected to be available by the end of the 3rd quarter of 2026 (subject to change) and that *no repairs are necessary at this point*." (Emphasis added.) The representation that "no repairs are necessary" is obviously false and a clear violation of Defendant's warranties. Yet Defendant continues to sell these Vehicles to unsuspecting buyers without any disclosures to the effect that such buyers risk not being able to enter, exit, lock, or unlock these Class Vehicles.

85. Had Defendant informed Plaintiffs and the Class about the Locking Defect, Plaintiffs and the Class would not have purchased or leased the Vehicles from Defendant, but rather would have purchased or leased different vehicles. Defendant knowingly sold a defective product to Plaintiffs and the Class, without disclosing such defect, and now refuses to provide an adequate long-term remedy, repair, or restitution for their actions.

86. Defendant's conduct described herein constitutes an omission of material fact and a deceptive business practice in violation of the statutory and common laws described herein.

**C. Consumers Have Reported the Locking Defect to NHTSA**

87. Audi, like other automobile manufacturers, reviews complaints made by consumers to the NHTSA.

88. Consumers have reported the Locking Defect to NHTSA, and in these complaints, report having taken their Vehicles to Audi authorized dealerships in their attempts to have the Locking Defect repaired.

89. Examples of complaints made to NHTSA about the Vehicles' Locking Defect are shown below, unedited:

- **NHTSA ID Number: 11702257, date complaint filed: 12/1/2025, model year: E-TRON 2021.**
  The vehicle's central locking system does not properly communicate with the keyfob resulting in the doors not unlocking as intended. I have had my child in the car seat in the back and if i accidentantly [sic] touch the handle the wrong way the doors will lock and I am unable to use the unlock feature to get my kid out. This could be a serious safety issue if someone becomes trapped in the rear seat and the central locking system does not allow unlocking of the doors.

- **NHTSA ID Number: 11630345, date complaint filed: 12/12/2024, model and year: E-TRON 2022.**
  on [sic] multiple occasions the automatic locking feature for the doors doesn't work and says to see manual. I'm afraid i [sic] will get locked in the vehicle.

- **NHTSA ID Number: 11648004, date complaint filed: 3/12/2025, model and year: Q4 E-TRON 2023.**
  In several occasions I have noticed my Audi Q4 windows and tailgate are open the next day in the morning in my garage, after I made sure all windows and doors are properly closed and locked, thank God hasn't happened when parking in open public parking lots and or in raining days. Also many times after locking doors and applying brake properly (after double checking before getting out of my car) I receive on myAudi App the notification that "is not locked ", [sic] and after checking my car it's "unlocked ". [sic] Sorry I don't have pictures for this issue.

- **NHTSA ID Number: 11718122, date complaint filed: 2/15/2026, model and year: Q4 E-TRON 2024.**
  I am filing this complaint due to ongoing electronic and drivetrain malfunctions that may impact safe vehicle operation. AWD System Malfunction (Primary Safety Concern) The vehicle repeatedly displays four-wheel drive system malfunction warnings. I have brought the vehicle to the

dealership three times for this same issue. The malfunction continues unresolved, raising concerns about traction, stability, and drivetrain reliability. Intermittent Entry Failure Biometric entry intermittently fails, forcing use of the key fob. This could delay access in emergency situations. Remote System Failures Remote vehicle functions (lock/unlock and climate control) operate inconsistently or fail entirely, often generating error messages. Audi has stated this is a system infrastructure issue with no current fix. Battery Power Inconsistency Although the battery indicates 100% charge, actual available power never reaches full output and drops shortly after driving. This creates uncertainty about vehicle performance and usable range. HUD Feature Does Not Perform as Advertised The head-up display does not show surrounding vehicle speeds as advertised, only colored indicators. This removes expected situational awareness information. Summary [sic] The vehicle exhibits repeated drivetrain warnings, electronic access failures, and inconsistent battery performance. These issues persist despite multiple service visits. I am requesting this complaint be formally recorded and investigated due to potential safety implications.

- **NHTSA ID Number:  11582811, date complaint filed: 4/13/2024, model and year: E-TRON Sportback 2022.**
  Unable to lock rear passenger side door, car displays "central locking Malfunction" warning.

- **NHTSA ID Number: 11674537, date complaint filed: 7/18/2025, 2017 model and year: Q6 E-TRON 2025.**
  What component or system failed or malfunctioned, and is it available for inspection upon request? The vehicle experienced an electrical malfunction that caused it to shut off or switch into an inoperable gear while in motion, without driver input. A "Central Locking: Malfunction" message appeared on the dashboard at the time of failure. Yes, the vehicle is currently with Audi North Atlanta and is available for inspection upon request. How was your safety or the safety of others put at risk? The vehicle lost power and became unresponsive while I was actively driving, putting me and others at risk of collision. In one instance, I was turning in an intersection on a busy road when the vehicle became undrivable. On another occasion, my child was in the back seat, and the car shut off despite both of us being fully restrained. Has the problem been reproduced or confirmed by a dealer or independent service center? Yes. The service manager at Audi North Atlanta confirmed that he experienced the same issue when the vehicle switched into an inoperable state after he shifted his weight in the seat while driving

> through the parking lot. He has acknowledged this as a potential seat sensor or occupancy detection issue and is currently conducting further research. Has the vehicle or component been inspected by the manufacturer, police, insurance representatives or others? Yes. The vehicle is currently under investigation by Audi North Atlanta, and Audi's Technical Field Manager for the Atlanta region has been involved in the review process. No police or insurance representatives have inspected the vehicle at this time. Were there any warning lamps, messages or other symptoms of the problem prior to the failure, and when did they first appear? Yes. A "Central Locking: Malfunction" warning message appeared on the dashboard at the time of the incidents. There were no prior warnings before the vehicle lost power and became unresponsive. The issue has occurred multiple times since.

**D. The Locking Defect Has Harmed Plaintiffs and the Class**

90. The Locking Defect has caused injury to Plaintiffs and the Class.

91. A vehicle purchased, leased, or retained with a material defect is worth less than the equivalent vehicle leased, purchased, or retained without the defect. The Locking Defect is a material defect because it precludes Vehicle owners from locking and unlocking their Vehicles as needed.

92. A vehicle purchased, leased, or retained under the reasonable assumption that it is safe is worth more than a vehicle known to contain a safety defect. The Locking Defect is an alarming safety defect.

93. Purchasers and lessees paid more for the Vehicles, through a higher purchase price or higher lease payments, than they would have had the Locking Defect been disclosed. Plaintiff and the Class overpaid for their Vehicles. Because of the concealed Locking Defect, Plaintiff and the Class did not receive the benefit of their bargains.

94. Plaintiffs and Class members overpaid for their Vehicles as a direct result of Defendant's failure to disclose the existence of the Locking Defect.

95. Plaintiffs and the Class have been denied the use and enjoyment of the Vehicles, suffering safety hazards when their Vehicles failed to lock or unlock as needed.

96. The unreliability of the locking system leaves Plaintiffs and Class members concerned that the system could fail to lock or unlock at any time.

97. Prior to purchasing or leasing the Vehicles, Plaintiffs and other Class members did not know that the Vehicles suffered from the Locking Defect and did not contemplate that they would be unable to reliably lock and unlock their luxury Vehicles.

98. As a result of their reliance on Defendant's omissions and/or misrepresentations, Plaintiffs and Class members have suffered ascertainable loss of money, property, and/or loss in value of their Vehicles.

99. The Vehicles were worth less than they would have been but for Defendant's failure to disclose and remedy the Locking Defect.

100. To date, Defendant has failed to remedy the Defect and continued to sell the Class Vehicles despite its knowledge of the Defect.

101. To date, Defendant has not demonstrated that it is capable of providing an adequate repair for the Defect, and Plaintiffs and Class members do not know whether Defendant is capable of providing a repair for the Defect. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiffs and members of the Class. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction enjoining Defendant and its agents, servants, and employees, and all persons acting under, in concert with, or for Defendant from engaging in the alleged misconduct and compelling a corrective recall campaign.

102. Accordingly, this action seeks redress for Plaintiffs and the Class in the form of compensatory damages, punitive damages, and injunctive relief, which would include, *inter alia*, an order directing Defendant to cease the challenged practices, including the manufacture, sale, and installation of the defective locking system, and initiate a program to provide refunds, repairs, and/or restitution to Plaintiffs and the Class.

### E. Defendant's Warranty and Maintenance Manual

103. The Vehicles come with a New Vehicle Limited Warranty ("NVLW") which states that Audi will cover any repairs to correct a manufacturer's defect in material or workmanship for 4 years or 50,000 miles, whichever occurs first.

104. The NVLW "covers any repair or replacement to correct a defect in manufacturer's material and workmanship (i.e., a mechanical defect). Your authorized Audi dealer will repair the defective part or replace it with a new or remanufactured Audi Genuine Part free of charge."

105. Defendant's warranty proclaims that "Audi's confidence in its vehicles is demonstrated by the extensive warranty package provided for you."

106. Plaintiffs and Class members reasonably relied on Defendant's warranties regarding the quality, safety and other material characteristics of the Class Vehicles.

## **TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL**

107. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.

108. Plaintiffs and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or the Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered—through the exercise of reasonable diligence—the existence of the Defect or that Defendant was concealing the Defect.

109. At all relevant times, Defendant is and was under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to Defendant's

exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

110. Defendant knowingly, actively, and affirmatively concealed the facts alleged herein, and the Defect itself. Plaintiffs and Class members reasonably relied on Defendant's knowing, active, and affirmative concealment.

111. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations.

## CLASS ACTION ALLEGATIONS

112. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiffs seek certification of a Nationwide Class initially defined as follows:

> **All persons in the United States who formerly or currently own or lease one or more of the Class Vehicles.**

113. In addition, or in the alternative, Plaintiffs seek certification of sub-classes initially defined as follows:

> **Arizona Class:**
>
> **All persons in the State of Arizona who formerly or currently own or lease one or more of the Class Vehicles, purchased, leased and/or serviced in the State of Arizona.**
>
> **California Class:**
>
> **All persons in the State of California who formerly or currently own or lease one or more of the Class Vehicles, purchased, leased and/or serviced in the State of California.**
>
> **Ohio Class:**
>
> **All persons in the State of Ohio who formerly or currently own or lease one or more of the Class Vehicles, purchased, leased and/or serviced in the State of Ohio.**

114. The above classes are referred to collectively as the Class. Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Vehicle for the purpose of resale.

115. Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division into other subclasses after conducting discovery.

116. Numerosity. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiffs are informed and believe that at least or near 100,000 consumers in the United States have purchased or leased the Class Vehicles.

117. Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether the Vehicles suffer from the Locking Defect;

b. Whether Defendant violated the CLRA, California Civil Code § 1750, *et seq*.;

c. Whether Defendant violated the UCL, California Business and Professions Code § 17200, *et seq*.;

d. Whether Defendant was negligent;

e. Whether Defendant fraudulently concealed the Locking Defect;

f. Whether Defendant is liable for a design and/or manufacturing defect;

g. Whether Defendant violated the Song-Beverly Act, California Civil Code § 1790, *et seq*.;

h. Whether Defendant violated the other state statutes prohibiting unfair and deceptive acts and practices; and

i. The nature of the relief, including equitable relief, to which Plaintiffs and the Class members are entitled.

118. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

119. Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

120. Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

121. Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendant's omissions and misrepresentations are uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

**California Consumer Legal Remedies Act, Cal. Civil Code § 1750, *et seq.***
**(On Behalf of Plaintiffs Parikh and Schilling and the California Class)**

122. Plaintiffs Parikh and Schilling incorporate by reference and re-allege the preceding paragraphs.

123. Plaintiffs Parikh and Schilling bring this claim individually and on behalf of the California Class.

124. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of

goods or services to consumers.

125. Plaintiffs Parikh and Schilling and each member of the California Class are consumers as defined by California Civil Code § 1761(d). Defendant intended to sell the Vehicles.

126. The Vehicles are goods within the meaning of California Civil Code § 1761(a).

127. Defendant violated the CLRA in at least the following respects:

a. in violation of § 1770(a)(5), Defendant represented that the Vehicles have approval, characteristics, and uses or benefits which they do not have (because they are defective);

b. in violation of § 1770(a)(7), Defendant represented that the Vehicles are of a particular standard, quality or grade, when they are of another (having a design defect, manufacturing defect or both);

c. in violation of § 1770(a)(9), Defendant has advertised the Vehicles as safe with the intent not to sell them as advertised (with the Locking Defect); and

d. in violation of § 1770(a)(16), Defendant represented that the Vehicles have been supplied in accordance with previous representations (with operating locking systems, of high quality, and being free of or warrantied for any design or manufacturing defects), when they were not.

128. Defendant knowingly and intentionally misrepresented to Plaintiffs Parikh and Schilling and to California Class members the characteristics of the Class Vehicle locking systems with respect to materials, manufacture, durability, design, longevity, maintenance and operating costs in at least the following respects:

a. Consistently representing in their marketing and promotional materials that the Class Vehicles are safe and reliable;

b. Consistently representing in information supplied through their

authorized dealers, in the warranty and maintenance booklets, and in the Monroney sticker, that the Class Vehicles have functioning locking systems; and

c. Failing to disclose the existence of the Locking Defect and that the Defect causes safety hazards, including, but not limited to trapping passengers inside the vehicle.

129. These misrepresented and omitted facts are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) a Class Vehicle. The Defect directly impacts the value of the Class Vehicles. The Vehicles' ability to lock or unlock are material concerns to Plaintiffs, California Class members, and reasonable consumers.

130. Plaintiffs relied on Defendant's fraudulent misrepresentations and omitted facts. Had Defendant disclosed the Locking Defect, for example on the dealership website, on the Monroney sticker, or in the warranty booklet, Plaintiffs Parikh and Schilling would have been aware of the Defect and behaved differently, either by purchasing or leasing a different vehicle or paying less for the Vehicles.

131. Defendant violated the Act by knowingly misrepresenting, concealing, and omitting material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and California Class members. Defendant misled Plaintiffs and California Class members and suppressed and concealed this information at the time of sale/lease, despite having actual knowledge of the Defect from at least the following sources that were exclusively in Defendant's possession: (1) pre-release testing data; (2) Defendant's own records of consumer complaints; (3) data from Defendant's dealers, including their repair records and part orders; (4) consumer complaints lodged with NHTSA and the resulting notice provided to Defendant; (5) warranty and post-warranty claims; (6) testing conducted in response to owner or lessee complaints; and (7) other internal sources of aggregate information about the ongoing locking system issues. Defendant knew, or should have known, that the representations and advertisements were false and misleading.

132. Defendant owed Plaintiffs and California Class members a duty to disclose the truth about the Defect because Defendant: (a) possessed exclusive knowledge of the Defect; (b) intentionally concealed the foregoing from Plaintiffs and the California Class members; (c) made incomplete and misleading representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the California Class members that contradicted these representations; and/or (d) the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects such as the Defect described herein and its corresponding safety risks.

133. Defendant's acts and omissions constitute unfair, deceptive, and misleading business practices in violation of California Civil Code §1770(a).

134. Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of receipt of Plaintiffs' written notice. Accordingly, pursuant to California Civil Code § 1782, Plaintiffs Parikh and Schilling seek actual, punitive, and statutory damages pursuant to the CLRA. Plaintiffs and the Class also seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution, disgorgement, statutory damages, and any other relief that the Court deems proper.

135. Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally and knowingly provided misleading information to the public.

## SECOND CAUSE OF ACTION

**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of Plaintiffs Parikh and Schilling and the California Class)**

136. Plaintiffs Parikh and Schilling incorporate by reference and re-allege the preceding paragraphs.

137. Plaintiffs Parikh and Schilling bring this claim individually and on behalf of a Class of California residents who formerly or currently own or lease one or more of the Vehicles.

138. Defendant engaged in unlawful, unfair, and/or fraudulent conduct under California Business & Professional Code § 17200, *et seq*.

139. Defendant's conduct is unlawful in that it violates the CLRA (as set forth above), the TREAD Act (by failing to timely inform the NHTSA of the Locking Defect and allowing the Vehicles to be sold with the Locking Defect), and the other statutory violations complained of herein.

140. Defendant's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs Parikh and Schilling and Class members. The harm to Plaintiffs Parikh and Schilling and Class members arising from Defendant's conduct outweighs any legitimate benefit Defendant derived from the conduct. Defendant's conduct undermines and violates the stated spirit and policies underlying the CLRA and TREAD Act as alleged herein.

141. Defendant's actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers. Defendant owed a duty to disclose the Defect as alleged herein.

142. Plaintiffs Parikh and Schilling relied on Defendant's fraudulent misrepresentations and omitted facts. Had Defendant disclosed the Locking Defect, for example on the dealership website, on the Monroney sticker, or in the warranty booklet, Plaintiffs Parikh and Schilling would have been aware of the Defect and behaved differently, either by purchasing or leasing a different vehicle or paying less for the Vehicles.

143. As a direct and proximate result of Defendant's violations, Plaintiffs Parikh and Schilling and California Class members suffered injuries in fact and lost money, as alleged herein, including that Plaintiffs Parikh and Schilling paid more for the Vehicles, through a higher purchase price or lease payments, than they would have had the Locking Defect been disclosed.

144. Plaintiffs Parikh and Schilling, on behalf of themselves and California Class members, seek equitable relief in the form of an order requiring Defendant to refund Plaintiffs and all California Class members all monies they paid for repairing and/or replacing the Vehicles, and injunctive relief in the form of an order prohibiting Defendant from engaging in the alleged misconduct and compelling a corrective recall campaign.

## THIRD CAUSE OF ACTION

### Arizona Consumer Fraud Act, Ariz. Rev. Stat. §44-1521, *et seq.*
### (On behalf of Plaintiff Knox and the Arizona Class)

145. Plaintiff Knox incorporates by reference and re-alleges the preceding paragraphs.

146. Plaintiff Knox brings this claim individually and on behalf of the Arizona Class.

147. The Arizona Consumer Fraud Act ("ACFA") prohibits "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. § 44-1522(A).

148. Defendant's conduct described herein violates the ACFA.

149. At all relevant times, Plaintiff Knox and the Arizona Class members are "consumers" pursuant to Arizona Revised Statute § 44-1521(6).

150. Defendant is a "person" within the meaning of Arizona Revised Statute § 44-1521(6).

151. The Class Vehicles sold, leased and/or advertised in Arizona constitute "merchandise" within the meaning of Arizona Revised Statute §§ 44-1521(5), (7).

152. As alleged in the foregoing, Defendant acted with a tendency or capacity to deceive consumers as to the existence of the Locking Defect. Defendant violated the

ACFA by employing deception, deceptive or unfair acts or practices, fraud, false pretense, false promises, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of the Class Vehicles sold, leased, or advertised in Arizona.

153. Defendant engages in deceptive and unfair business practices in violation of the ACFA by actively advertising, marketing, and representing the Class Vehicles as safe and reliable and consistently representing through information supplied through Defendant's authorized dealers, in the warranty and maintenance booklets, and in the Monroney sticker, that the Class Vehicles are safe, reliable, and high quality and have functioning locking systems.

154. In violation of the ACFA, Defendant misrepresented, concealed, and omitted material facts regarding the locking system and the Defect with the intent to mislead Plaintiff Knox and Arizona Class members to purchase or lease the Class Vehicles, which were materially different from and inferior to the vehicles as advertised and represented.

155. Defendant acted "willfully" within the meaning of the ACFA because Defendant intentionally and knowingly provided misleading information to the public and omitted and concealed material facts.

156. As alleged in the foregoing, Defendant owed Plaintiff Knox and Arizona Class members a duty to disclose the truth about the Defect because Defendant: (a) possessed exclusive knowledge of the Defect; (b) intentionally concealed the foregoing from Plaintiff Knox and the Arizona Class members; (c) made incomplete and misleading representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Knox and the Arizona Class members that contradicted these representations; and/or (d) the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects such as the Defect described herein and its corresponding safety risks.

157. Defendant's unlawful acts present a continuing harm to Plaintiff Knox, Arizona Class members, and the public. Defendant's unlawful acts and practices affect the public interest.

158. To date, Defendant's modifications and software updates instituted in response to the Defect have not been adequate to remedy the Locking Defect.

159. As direct and proximate causes of Defendant's ACFA violations, Plaintiff Knox and the Arizona Class have been misled/deceived and damaged including, but not limited to, the cost of repairs required to attempt to resolve the lock failure, and the inability to satisfactorily repair the Locking Defect, the financial loss of owning or leasing the Vehicles that are unsafe due to the locking system failure, and the fear and risk of injury as a result of a failure to lock or unlock the Vehicle.

160. Plaintiff Knox and the Arizona Class seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**

**Ohio Consumer Sales Practices Act (Ohio Rev. Code § 1345.01, *et seq.*)**
**(On behalf of Plaintiff Melaragno and the Ohio Class)**

161. Plaintiff Melaragno incorporates by reference and re-alleges the preceding paragraphs.

162. Plaintiff Melaragno brings this claim individually and on behalf of the Ohio Class.

163. The Ohio Consumer Sales Practice Act ("OCSPA") prohibits a supplier from employing an unfair, deceptive or "unconscionable act or practice in connection with a consumer transaction. . . . before, during, or after the transaction." Ohio Rev. Code §§ 1345.02(A) & 1345.03(A).

164. Defendant's conduct described herein violates the OCSPA.

165. At all relevant times, Plaintiff Melaragno and Ohio Class members are "consumers" pursuant to Ohio Rev. Code § 1345.01(D).

166. Defendant is a "person" within the meaning of Ohio Rev. Code § 1345.01(B).

167. The Class Vehicles were sold or leased in "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

168. As alleged in the foregoing, Defendant's acts and omissions were unfair and deceptive in violation of the OCSPA in at least the following respects:

a. in violation of § 1345.02(B)(1), Defendant misrepresented that the Vehicles have approval, performance characteristics, accessories, uses, or benefits that they do not have;

b. in violation of § 1345.02(B)(2), Defendant misrepresented that the Vehicles are of a particular standard, quality, or grade, when they are not;

c. in violation of § 1345.02(B)(5), Defendant misrepresented that the Vehicles are supplied in accordance with Defendant's previous representations regarding the quality and use of the locking systems, when the locking systems are defective; and

d. Defendant's breach of implied warranty, as alleged herein, constitutes an additional unfair and deceptive act in violation of Ohio Rev. Code § 1345.02.

169. As alleged herein, Defendant's knowing and intentional concealment of the Locking Defect and misrepresentations regarding the locking system and quality of the Vehicles was unconscionable in at least the following respects:

a. in violation of § 1345.03(B)(1), Defendant knowingly took advantage of Plaintiff Melaragno and Ohio Class members' inability to protect their interest because of their ignorance of, and inability to identify, the Locking Defect;

b. in violation of § 1345.03(B)(3), Defendant knew at the time of the transaction that Plaintiff Melaragno and Ohio Class members would

be unable to receive a substantial benefit from the Vehicles based upon the Locking Defect; and

c. in violation of § 1345.03(B)(6), Defendant knowingly made misleading statements of opinion on which consumers were likely to rely to their detriment.

170. Plaintiff Melaragno and the Ohio Class relied to their detriment on Defendant's unfair, deceptive, and unconscionable practices.

171. As a direct and proximate result of Defendant's violations, Plaintiff Melaragno and Ohio Class members suffered injuries in fact and lost money including, but not limited to, the cost of repairs required to attempt to resolve the lock failure, and the inability to satisfactorily repair the Locking Defect, the financial loss of owning or leasing the Vehicles that are unsafe due to the locking system failure, and the fear and risk of injury as a result of a failure to lock or unlock the Vehicle.

172. Plaintiff Melaragno and Ohio Class members seek all monetary and nonmonetary relief allowed by law, including injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

**Negligence**

**(On behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Arizona, California, and Ohio Classes)**

173. Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

174. Plaintiffs bring this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of the Arizona, California, and Ohio Classes.

175. Defendant has a duty to its customers as a manufacturer of motor vehicles to design, manufacture, market, and provide vehicles that, in their ordinary operation, are reasonably fit for their intended uses. Defendant has a duty to adequately test its Vehicles before selling to consumers worldwide.

176. Defendant has a duty to test Vehicles for system locking issues once Defendant was on notice that its Vehicles had a propensity to fail to lock or unlock as required by ordinary use.

177. Defendant has a duty to provide true and accurate information to the public to prevent undue risks arising from the foreseeable use of its Vehicles.

178. At all times relevant, Defendant sold, marketed, advertised, distributed, and otherwise placed Vehicles into the stream of commerce in an unlawful, unfair, fraudulent, and/or deceptive manner that was likely to deceive the public. As a result of Defendant's fraudulent acts in the formation and performance of the purchase and lease contracts at issue here, the economic loss doctrine does not bar Plaintiffs' negligence claim.

179. Defendant was negligent and breached the above duties owed to Plaintiffs and Class members.

180. As direct and proximate causes of Defendant's breaches, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required to attempt to resolve the lock failure, and the inability to satisfactorily repair the Locking Defect, the financial loss of owning or leasing the Vehicles that are unsafe due to the lock failure, and being subjected to potential risk of injury as a result of a failure to lock or unlock the Vehicle.

## SIXTH CAUSE OF ACTION

**Product Liability – Design/Manufacturing Defect**
**(On behalf of Plaintiffs and the Nationwide Class,**
**or Alternatively, the Arizona, California, and Ohio Classes)**

181. Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

182. Plaintiffs bring this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of the Arizona, California, and Ohio Classes.

183. Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired,

retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the Vehicles and their defective locking systems, which were intended by Defendant to be used as passenger vehicles and for other related activities.

184. Defendant knew that the Vehicles were to be purchased and used without inspection for or discovery of the Locking Defects by Plaintiffs and Class members.

185. The Vehicles were unfit for their intended uses by reason of the Locking Defect in their manufacture, design, testing, components, and constituents, so that they would not safely serve their ordinary and intended purpose.

186. Defendant designed and/or manufactured the Vehicles defectively, causing them to fail to perform as safely as an ordinary customer would expect when used in an intended or reasonably foreseeable manner.

187. Plaintiffs and Class members were not aware of the Locking Defect at any time prior to the recent revelations regarding problems with the Vehicles.

188. As direct and proximate causes of the Locking Defect, Plaintiffs and the Class have been damaged including, but not limited to, the cost of repairs required due to the Locking Defect, and the financial loss of owning the Vehicles that are unsafe.

## SEVENTH CAUSE OF ACTION

**Song-Beverly Consumer Warranty Act, Cal. Civil Code § 1790, *et seq.***
**(On Behalf of Plaintiffs Parikh and Schilling and the California Class)**

189. Plaintiffs Parikh and Schilling incorporate by reference and re-allege the preceding paragraphs.

190. Plaintiffs Parikh and Schilling bring this claim individually and on behalf of the California Class.

191. Plaintiff Schilling and Class members who purchased or leased new Class Vehicles in California are “buyers” within the meaning of Cal. Civ. Code § 1791(b).

192. Plaintiff Parikh and Class members who purchased or leased used Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1795.5.

193. The Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

194. Defendant is a "manufacturer" of the Vehicles within the meaning of Cal. Civ. Code § 1791(j). The Song-Beverly Act imposes the same duties on any "distributor or retail seller of used consumer goods in a sale in which an express warranty is given." Cal. Civ. Code § 1795.5. Defendant is a distributor of used consumer goods because Defendant operates through and/or partners with its dealerships to sell and lease used vehicles directly to the public and offers express warranties as part of the sales package.

195. Defendant impliedly warranted to Plaintiffs Parikh and Schilling and the California Class that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Vehicles do not have the quality that a buyer would reasonably expect and were not merchantable.

196. Cal. Civ. Code § 1791.1(a) states that "implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

197. The Vehicles would not pass without objection in the automotive trade because of the Locking Defect that causes the Vehicles to lock users in or out and fails to lock as needed, leading to serious safety concerns.

198. Because of the Locking Defect, the Vehicles are not safe even to park and thus are not fit for ordinary purposes.

199. The alleged Locking Defect was present in each Vehicle at the time of sale.

200. The Vehicles are not adequately labeled because the labeling fails to disclose the Locking Defect and its dangerous safety implications.

201. Defendant breached the implied warranty of merchantability by manufacturing and selling Vehicles containing the Locking Defect.

202. The Locking Defect has deprived Plaintiffs Parikh and Schilling and the California Class of the benefit of their bargain and caused the Vehicles to depreciate in value.

203. As a direct and proximate result of Defendant's breach of its duties, Plaintiffs Parikh and Schilling and California Class Members received goods whose condition substantially impairs their value. Defendant's conduct has damaged Plaintiffs Parikh and Schilling and the California Class through the diminished value, the malfunctioning, and the nonuse of their Vehicles.

204. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs Parikh and Schilling and California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Vehicles, or the overpayment or diminution in value of their Vehicles.

205. Under Cal. Civ. Code § 1794, Plaintiffs Parikh and Schilling and California Class members are entitled to costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION

**Breach of Express Warranty**

**(On behalf of Plaintiffs Parikh, Knox, and Melaragno and the Nationwide Class, or Alternatively, the Arizona, California, and Ohio Classes)**

206. Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

207. Plaintiffs Parikh, Knox, and Melaragno bring this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of the Arizona, California, and Ohio Classes.

208. Defendant is a "merchant" as defined under the Uniform Commercial Code ("UCC").

209. The Class Vehicles are "goods" as defined under the UCC.

210. Defendant expressly warranted that the Vehicles were of high quality and, at a minimum, that the locking system would function properly.

211. Defendant expressly warranted that Defendant would repair any defects in materials or workmanship free of charge during the applicable warranty periods. Defendant offers similar warranties on certified used Audis and extended warranties for both new and used vehicles.

212. Defendant breached its express warranty by failing to provide an adequate repair when Plaintiffs and Class members brought their Class Vehicles to authorized Audi dealerships following manifestation of the Locking Defect.

213. Defendant's warranties formed the basis of the bargain reached when Plaintiffs Parikh, Knox, and Melaragno and Class members purchased or leased their Class Vehicles.

214. Plaintiffs Parikh, Knox, and Melaragno and Class members experienced the Locking Defect during the warranty period. Despite Defendant's knowledge of the existence of the express warranty, Defendant failed to inform Plaintiffs Parikh, Knox, and Melaragno and Class members that the Class Vehicles were defective and failed to fix the Locking Defect.

215. The limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because Defendant has failed and/or has refused to adequately provide the promised remedies within a reasonable timeframe.

216. As a result of Defendant's actions, Plaintiffs Parikh, Knox, and Melaragno and Class members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, diminished vehicle value, substantial loss in resale value of the vehicles, and other related damages.

217. Defendant received adequate notice of the issues complained of herein by pre-sale testing, complaints with NHTSA, dealership visits, customer complaints, *inter alia*, within a reasonable amount of time.

218. Plaintiffs Parikh, Knox, and Melaragno and Class members have complied

with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## NINTH CAUSE OF ACTION

**Breach of the Implied Warranty of Merchantability**
**(On behalf of Plaintiffs and the Nationwide Class, or Alternatively, the Arizona, California, and Ohio Classes)**

219. Plaintiffs incorporate by reference and re-allege the preceding paragraphs.

220. Plaintiffs bring this claim individually and on behalf of the nationwide Class, or, alternatively in the event the Court declines to certify a nationwide Class, on behalf of the Arizona, California, and Ohio Classes.

221. A warranty that the Class Vehicles were of merchantable quality and condition is implied by law in transactions for the purchase and lease of Class Vehicles. Defendant impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and substantial freedom from defects.

222. The Class Vehicles, when sold and leased, and at all relevant times, were not of merchantable quality or condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that the door locks—a central and critical component of the Class Vehicles—are prone to malfunction and failure due to a common defect. The Locking Defect renders the Class Vehicles unmerchantable, as they are unreliable, unsafe, partially or fully inoperable, and not substantially free from defects.

223. Defendant received adequate notice of the issues complained of herein, through pre-sale testing, complaints with NHTSA, dealership visits, and customer complaints, *inter alia*, within a reasonable amount of time.

224. Plaintiffs and Class members have had sufficient direct dealings with either Defendant or its agents (e.g., dealerships and customer service) to establish privity of contract between Defendant on one hand and Plaintiffs and each of the Class members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of

the Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, specifically of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided alongside the Class Vehicles; the warranty agreements were designed for and intended to benefit the end-consumers only.

225. As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs and Class members were injured and are entitled to damages including, but not limited to, diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs Jay Parikh, Sienna Knox, Melanie Melaragno, and John Schilling as Class Representatives and appointing the undersigned counsel as Class Counsel;

B. Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiffs and the other members of the Class;

C. Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and the other members of the Class;

D. Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective recall campaign;

E. Equitable relief, including in the form of buyback of the Class Vehicles;

F. Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

G. Ordering Defendant to pay Plaintiffs' attorneys' fees and litigation costs;

H. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

I. Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: July 1, 2026

Respectfully submitted,

*/s/ Theodore Maya*

Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Lisa Cintron (SBN 356009)
*lcintron@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave., Suite 500
Burbank, CA 91505
(310) 474-9111 *(telephone)*
(310) 474-8585 *(facsimile)*

*Counsel for Plaintiffs*